J-S64036-17 & J-S64037-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: I.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 932 MDA 2017 |

Appeal from the Decree Entered May 3, 2017
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s):  17-ADOPT-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: I.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 933 MDA 2017 |

Appeal from the Order Entered May 3, 2017
In the Court of Common Pleas of Franklin County Juvenile Division at
No(s):  CP-28-DP-0000043-2016

BEFORE:   PANELLA, J., SHOGAN, J., and FITZGERALD*, J.

MEMORANDUM BY FITZGERALD, J.:                **FILED DECEMBER 11, 2017**

In these related appeals, R.M. ("Father"), appeals from the decree and

order of the Franklin County Court of Common Pleas that involuntarily

terminated his parental rights to his daughter, I.M. ("Child"), born in May of

_____
*   Former Justice specially assigned to the Superior Court.

2016, and changed Child's permanency goal from reunification to adoption.[1] We affirm.

On May 16, 2016, Franklin County Children and Youth Services ("CYS") filed an application for Emergency Protective Custody of Child. Petitioner's Exhibit 1. In its application, CYS averred that it had an extensive history with Mother spanning over 24 months, which involved Mother's two older children who had already been removed from her care. *Id.* The orphans' court granted the application and Child was placed in foster care after Child's birth. Child remained in foster care following an adjudication and disposition hearing on June 13, 2016. Petitioner's Exhibit 4.

When Child initially came into care, the identity of Child's biological Father was unknown. Although Father had signed an Acknowledgement of Paternity at the hospital following Child's birth, Mother later suggested that her husband, and not Father, was Child's biological Father. Mother later indicated that Father was actually Child's biological Father, and Father

---

[1] Father's appeal from the decree terminating his parental rights is docketed at 932 MDA 2017, and his appeal from the order changing Child's goal is docketed at 933 MDA 2017.

A.L. ("Mother") signed a waiver to voluntarily terminate her parental rights to Child. However, after a colloquy, the orphans' court questioned the voluntariness of her relinquishment and held a hearing on the petition to terminate Mother's parental rights. The orphans' court found clear and convincing evidence to support the involuntary termination and, by separate decree, terminated the parental rights of Mother. Mother did not file a brief in connection with this appeal, nor did she file her own separate appeal.

acknowledged paternity of Child through a support action filed with the Franklin County Domestic Relations office.

On April 12, 2017, CYS filed petitions to involuntarily terminate Father's parental rights to Child and to change Child's permanency goal to adoption. The orphans' court conducted a combined termination and goal change hearing on May 2, 2017. At the hearing, CYS presented the testimony of Emily Beckner, program director at Alternative Behavioral Consultants ("ABC"), and Elizabeth Johnston, the caseworker assigned to Father's case. Father testified on his own behalf. Following the hearing, the orphans' court terminated Father's parental rights and changed Child's permanency goal to adoption, and on May 3, 2017, entered its decree and order. On June 1, 2017, Father timely filed separate notices of appeal and concise statements of matters complained of on appeal pursuant to 1925(a)(2)(i) and (b).

Father, in his appeal from the decree terminating his parental rights, raises the following issues for our review:

> I. Was there clear and convincing evidence presented at trial to establish that Father had evidenced a settled purpose of relinquishing parental claim to [Child] or that he refused or failed to perform parental duties for six months immediately prior to the [p]etition?
>
> II. Was there clear and convincing evidence to show that there was a repeated and continued incapacity, abuse, neglect or refusal of Father that has caused Child to be without essential care, control or subsistence necessary for [Child's] physical or mental well-being and the conditions and causes of the incapacity, abuse or neglect or refusal cannot or will not be remedied by Father[?]

III. Was there clear and convincing evidence to determine that the child will not be harmed by the severing of the bond with Father?

Father's Brief, 932 MDA 2017, at 14.

Our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond

between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), (5) and (b). We need only agree with the court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the orphans' court's decision to terminate under section 2511(a)(1) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re D.J.S.*, 737 A.2d 283, 285 (Pa. Super. 1999) (citation omitted). Although the six months immediately preceding the filing of the petition are the most critical to the analysis, "the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). Additionally, to the extent that the orphans' court based its decision to terminate parental rights pursuant to subsection (a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b). We explained that "[a] parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (citation omitted).

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the orphans' court must then engage in three additional lines of inquiry: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

In the instant matter, the orphans' court found that CYS presented clear and convincing evidence in support of its petition to terminate Father's parental rights pursuant to section 2511(a)(1). Orphans' Ct. Op., 7/5/17, at 27-28. The court reasoned that the conditions requiring Child's placement in foster care continued to exist and emphasized Father's instability and lack of progress during Child's dependency. **Id.** at 23-28. The court questioned Father's effort and commitment to Child and expressed concern over "Father's ability or desire to overcome obstacles to parenting Child." **Id.** at 27.

Father asserts that the evidence presented did not demonstrate that termination of his parental rights was appropriate. In particular, Father argues that he has remedied the facts and circumstances that rendered him incapable of parenting Child, and that he has remained in full compliance with the permanency plan put in place by CYS. Father's Brief, 932 MDA 2017, at 20-21. Father alleges that, to the extent some goals may remain

unaddressed, his limited resources "limit his ability to address some of the concerns" and are "something that is out of his control." *Id.* at 20.

Our review of the record supports the orphans' court's findings. Father's permanency plan required him to participate in medication management, complete a parental fitness assessment, obtain and maintain financial stability, visit with Child, comply with the terms of his probation, refrain from further criminal charges, participate in the Non-Violence Intervention Services ("NOVIS") program, complete a drug and alcohol evaluation and follow through with any recommendations, and participate in random drug screens. N.T., 5/2/17, at 55.

Regarding Father's goal to participate in medication management, CYS caseworker, Elizabeth Johnston, testified that although Father was initially consistent with his mental health treatment, Father's last confirmed medication management appointment was December 16, 2016. While Father alleged that he was consistent in attending his treatment sessions, Father was unable to provide any documentation to the court confirming his attendance.

Moreover, Father failed to complete the parental fitness assessment. Emily Beckner, program director at ABC, testified that Father was scheduled to participate in a parental fitness assessment at ABC on January 6, 2017. *Id.* at 16. However, despite repeated attempts to confirm the assessment, Father never confirmed that he would attend the appointment and the assessment

was cancelled. *Id.* at 17. Father alleged that he attempted to reschedule the appointment with Ms. Johnston, but that Ms. Johnston never got back to him.

Further, Ms. Beckner testified that the assessment consisted of two components: a psychological portion and a parent/child observation. *Id.* at 19. Ms. Beckner noted that the parent/child observation had to be completed in a private setting in order to see a true picture of [Father's] parental abilities. *Id.* at 20. In that regard, ABC requested that Father provide them with documentation that his home was not infested with bed bugs before it could conduct the assessment in Father's home. Father denied having bed bugs in his home and further claimed that his mother, Paternal Grandmother, arranged for Ehrlich Pest Control to inspect the home for bed bugs. *Id.* at 93-94. When ABC asked Father to provide them with documentation that Ehrlich had inspected the home, Father alleged that it was against Ehrlich's policy to provide them with the requested documentation. *Id.* at 111, 114. Father later signed a release to permit CYS to contact Ehrlich, who indicated that they had no record of ever being at Father's residence. *Id.* at 61.

Likewise, Father also failed to comply with the terms of his parole, which stemmed from a domestic violence incident involving Mother.[2] Father pled guilty to simple assault and was sentenced to time served (sixty-three days)

_____

[2] At the time of the incident, Mother was pregnant with Child.

to twenty-three months in Franklin County Jail. Petitioner's Exhibit 17. Father was also ordered to have no contact with Mother. *Id.*

On July 4, 2016, Father violated his parole for the first time when he contacted Mother and assaulted her. Petitioner's Exhibit 16. Father pleaded *nolo contendere* to simple assault and was incarcerated for four months. *Id.*; N.T., 5/2/17, at 98-99. In February of 2017, Father, again, violated his parole and contacted Mother. N.T., 5/2/17, at 99.

Finally, Father has failed to demonstrate that he can maintain safe and stable housing. Father currently resides with Paternal Grandmother in a one-bedroom home. *Id.* at 92. Father acknowledged that the home was not a permanent residence. Nonetheless, the only attempts Father made to find suitable housing included submitting an application for public housing and walking around downtown Chambersburg. *Id.* at 92, 115.

The orphans' court, as the trier of fact, had no obligation to credit Father's testimony regarding his compliance with CYS's permanency plan. The orphans' court was free to make credibility determinations, accept or reject the testimony of the witnesses in whole or in part, and make reasonable inferences from the evidence it considered credible. *See In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). The fact that Father has been unable to complete his parental fitness assessment, maintain safe and stable housing, and comply with the terms of his parole for any appreciable amount of time supports the orphans' court's conclusion that Father refuses and fails to

perform his parental duties. Moreover, the trial court had ample basis to reject Appellant's explanations for his failure to comply. Accordingly, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights pursuant to section 2511(a)(1).

Next, Father argues that the orphans' court erred in finding termination of his parental rights would best serve the developmental, physical, and emotional needs and welfare of Child under section 2511(b). We have discussed our analysis under section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term bond is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations and quotation marks omitted).

- 11 -

In addressing the best interests and welfare of Child, the orphans' court found:

> In consideration of the emotional bond between Father and [Child], it seems that the present relationship is marginal, even superficial, at best. The existence of some bond between [Child] and Father does not necessarily defeat termination. The question is whether the bond between [Child] and Father is the one worth saving or whether the bond could be sacrificed without permanent harm to [Child]. [Child] has become familiar with Father, based on the number of visits the two have shared, but this level of comfort and familiarity does not equate to a true parent/child bond. No evidence suggests that Father has a strong bond with [Child] equal to her bond with her foster parents, that terminating Father's parental rights will sever an existing beneficial relationship, or that terminating Father's parental rights will result in irreparable harm to [Child].
>
> In contrast, the relationship between [Child] and the pre-adoptive foster parents has proven beneficial to [Child]. [Child] has been in the care of her foster parents since just after her birth. [Child] sees a specialist for concerns of a hole in her heart and her foster parents have appropriately scheduled medical appointments and monitor her. [Child] is very active in her foster home and she is a happy baby. [Child] plays with toys and plays with her brother, who also resides at the foster home.

Orphans' Ct. Op. at 36.

The record supports the orphans' court's finding that Child's primary bond is with her foster family, rather than Father. Further, the record supports the finding that Child will not suffer irreparable harm if Father's parental rights are terminated. It was within the orphans' court's discretion to accept the testimony of Ms. Johnston and Ms. Beckner, and to conclude that the benefits of a permanent home with her foster family would outweigh any emotional

distress Child might experience if Father's parental rights were terminated. While Child has a relationship with Father, it was within the orphans' court's discretion to conclude that this bond is outweighed by her need for permanence and stability. Child is closely bonded with her foster parents, and the record reveals that Child's half-brother[3] also resides in the foster home. Accordingly, we find no abuse of discretion in the orphans' court's conclusion regarding subsection (b) that Child's developmental, emotional, and physical needs and welfare are best met by terminating Father's parental rights.

We next address Father's claim that the orphans' court erred and/or abused its discretion by changing Child's permanency goal from reunification to adoption. Father raises the following question in his appeal from the goal change order:

> I. Did the [orphans' court] abuse its discretion when it changed the goal for [Child] from reunification to adoption when Father presented evidence that he would be able to remedy the conditions that lead [sic] to the removal of [Child] within a short period of time and when [Child] had only been in placement for less [sic] one year?

Father's Brief, 933 MDA 2017, at 8. Father argues that the goal change to adoption was not in Child's best interest. Father asserts that he has "a great relationship" with Child and that Child will "be negatively affected by no longer seeing Father." *Id.* at 13-14.

---

[3] Mother has two older children from other relationships. Dependency Petition, 5/17/16, at 3-5.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Goal change proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375. This Court has summarized the requisite analysis as follows:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

In support of its decision to change Child's permanency goal from reunification to adoption, the orphans' court stated as follows:

> As discussed above, Father was not in compliance with the family service plan. We agree that Father has consistently visited with [Child] after her birth, upon his release from incarceration. Unfortunately, his failure to address the bed bug issue ruined his opportunity to learn and develop his

parenting skills with the assistance of parent educators at ABC. He squandered this very valuable opportunity to visit with [Child] in a home-like setting where he could demonstrate growth and improvement in his parenting skills. We don't view having to deal with a bed bug infestation as an insurmountable obstacle outside of Father's control. He either could not—through lack of problem-solving abilities, or would not—because of defiance or lack of interest—address the issue.

Similarly, Father's periods of incarceration also hindered his ability to develop his parenting skills and his bond with his daughter. During the pendency of this case, Father committed new criminal offenses, as well as failed to abide by the terms of his prior sentence, resulting in incarceration. Father's choices again thwarted reunification efforts.

Father did not have suitable housing, did not completed [sic] a parental fitness assessment, and did not provided [sic] documentation of compliance with mental health services, parole supervision, or NOVIS. The goal of reunification was not feasible in a reasonable period of time given Father's demonstrably lax effort at compliance.

Even if Father had agreed to submit to the parental fitness assessment immediately after the TPR hearing, this Court believes it very likely that additional services would have been required before reunification could have been seriously considered. We base this conclusion on the observations of Balmer [sic] and Johnston who both testified to Father's lack of parenting abilities and lack of engagement and bond with [Child].

Conversely, [Child] is safe, secure, and thriving in the pre-adoptive foster home she has known since just after her birth. The evidence supports a finding that [Child] enjoys a significant bond with her foster family. While she may have grown comfortable and familiar with Father, this is simply not the same thing as a parent-child bond. [Child] will likely suffer no lasting ill-effects from severing her relationship with Father.

Orphans' Ct. Op. at 40-42.

Father fails to support his argument with regard to this issue with any citation to legal authority. Pursuant to Pa.R.A.P. 2119(a), "The argument shall be divided into as many parts as there are questions to be argued . . . followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). "Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." **Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa. Super. 2006) (citations omitted).

The closest Father comes to making an argument appears in his Summary of Argument and Standard of Review, where he states that the standard of review for goal change proceedings is an abuse of discretion and that court must determine whether the goal change is in the best interest of the child. The lack of any legal analysis or citation to case law to support his argument, and any explanation of Father's argument in relation to that case law, precludes our meaningful appellate review of Father's challenge to the change in permanency goal.

Even if we did not find Father's argument waived, we likewise would conclude that his claim does not merit any relief, as the record supports the orphans' court's findings. Throughout the history of this case, Father has had the same permanency goals. At every review hearing, the court has reiterated Father's need to participate in medication management, find suitable and stable housing, and comply with the terms of his parole. Father, however,

remained noncompliant with these goals and unable to parent Child. By the time of the termination and goal change hearing, Child had been in the care of foster parents for her entire life, and it was not clear when, if ever, Father would be in a position to care for her. While it is true that Father maintains a relationship with Child by regularly attending his visits, it was within the orphans' court's discretion to conclude that this relationship is outweighed by Child's need for permanence and stability.

Based on the foregoing, we conclude that the orphans' court did not commit an error of law or abuse its discretion by terminating Father's parental rights and changing Child's permanency goal from reunification to adoption. Therefore, we affirm the court's decree and order.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/11/2017